Moncure, P.,
delivered the opinion of the court.
On the 14th day of December, 1874, Juan P. Sherman, administratrix of Nathan G. Sherman, deceased, brought an action of trespass on the case against the Daltimore and Ohio Railroad Company, in the circuit court of Shenandoah county. The action was brought under the provisions of the act of 1870-71, ch. 29, p. 27, §§ 1, 2, 3 and 4, which are embodied in the Code of 1873, p. 996, ch. 145, §§ 7, 8, 9 and 10, which are as follows:
“ 7. Whenever the death of a person shall be caused by the wrongful act, neglect or default of any person or corporation, and the act, neglect or default is such as would (if death had not ensued), have entitled the party injured, or if she be a married woman, her husband, either separately, or together with her, to maintain an action and recover damages in respect thereof, then, and in every such case, the person who, or the corporation which would have been liable if death had not ensued, *604 shall be liable to an action for damages, notwithstanding the death of the person injured, and although the death have been caused under such circumstances as amount in law to a felony, provided that in no case shall the recovery exceed the sum of ten thousand dollars.
-®very su°k action shall be brought by and in the name of the personal representative of such deceased pers011j anc! within twelve calendar months after his or her death. The jury in any such action may award such damages as to it may seem fair and just, and may direct in what proportion they shall be distributed to the wife, husband, parent and child of the deceased.
“ 9. The amount recovered in any such action shall, after the payment of costs and reasonable attorneys’ fees, be paid to the wife, husband, parent and child of the deceased, in such proportion as the jury may have directed, or if they have not directed, according to the statute of distributions, and shall be free from all debts and liabilities of the deceased; but if there be no wife, husband, parent or child, the amount so received shall be assets in the hands of the personal representative, to be disposed of according to law.
“ 10. Eights of action under this act shall not determine, nor shall such actions, when brought, abate by death of the defendant.”
The declaration contains five counts, and is, in substance, as follows:
In the first count, it. is charged that the defendant on the 3d day of September, 1874, on the track of a certain railroad running through the corporate limits of the town of Edinburg in said county, and within the corporate limits of said town, then and before the committing of the grievances thereinafter mentioned, in the possession and use of, and operated by said company, for the purpose of running steam locomotive ■ engines and coaches on and over the same, did carelessly-and negligently, and *605 with great force and violence run and drive its engines and coaches upon and against said Nathan G-. Sherman, there then being, and thereby, then and there, with engine and coaches, did so greatly wound said Nathan G-. Sherman, that by reason thereof he then and there difed, and his death was caused by said wrongful act, neglect and default of said railroad company, wherefore the plaintiff, administratrix aforesaid, says she is entitled to l’eeover damages to the amount of ¡§10,000 under the laws of Virginia for such cases made and provided, and therefore she brings suit, &c.
In the second count it is, among other things, charged that the defendant did so carelessly and negligently manage and conduct a train of cars, that by reason thereof the rear car of said train became detached and separated from the other cars of same, and being so detached and separated, ran with great force and violence against said Nathan Gr. Sherman there then being, and thereby did so greatly wound him that by reason thereof he then and there died, &c.
In the third, count it is, among other things, charged that the defendant did so carelessly and negligently manage and conduct a train of cars, that by reason thereof the rear cars of the same became detatched and separated from said train while it was in rapid motion, and being so detached and separated ran with great force and violence against said Nathan. Gr. Sherman, who was walking within the corporate limits of said town of Edinburg on the track of said railroad, in the same direction that said train was running, and who had stepped on said track after said train passed him, and in the interval between said train and said detached rear cai’S, and thereby with said cars then and there did so greatly wound said Nathan Gr. Sherman, that by reason thereof he then and there died, &c.
In the fourth and fifth counts it is, among other things, *606 charged that the said injury complained of was done “ on the track of a certain railroad in Shenandoah county,” of “ a certain railroad running through the corporate limits of the town of Edinburg in said county,” as cffsn’ged in the other counts. The defendant demurred to the declaration, and to each count thereof, and the plaintiff joined in the demurrer. The defendant also put in the plea of not guilty, on which the plaintiff joined issue.
On the 25th day of August, 1875, the demurrer being argued, was overruled, and a jury was sworn to try the general issue joined between the parties, but being unable to agree after being together several days, a juror was withdrawn and the cause continued.
On the 8th day of December, 1875, another jury was sworn to try the case, which, after being several days engaged in such trial, at length found1' a verdict in these words: “We, the jury, find for the plaintiff upon the issues joined, and ascertain the damages of said plaintiff at the sum of $3,000.” And on the 20th day of Decembei’, 1875, a judgment was rendered in favor of the plaintiff’ against the defendant for the said sum of $3,000, with legal interest from the 18th day of December, 1875, until paid, and the costs of plaintiff in that behalf expended.
To the said judgment the defendant applied to a judge of this court for a writ of error and supersedeas; which was accordingly awarded.
The first assignment of error in this case is that' the court erred in overruling the demurrer to the declaration and each count thereof.
We are of opinion that the circuit court did not err in this respect. Neither is the whole declaration, nor is any count thereof, demurrable. The defendant is sued as a corporation, and there is no affidavit in the case denying such incorporation. In such case it is expressly made *607 unnecessary, by statute, to prove the fact of the incorporation. Code, p. 1094, ch. 167, § 40. Much less is it necessary to aver such fact in the declaration. 8 son’s Pract. (new edition), p. 524, and the cases cited. This court as well as the court below will, ex officio, take notice of the fact.
The second assignment of error is that the court erred in allowing the evidence of the witness, Hockman, to go to the jury in reference to the family left by the deceased, 27. Gr. Sherman, after objection.
This assignment of error is founded on the first and second bills of exceptions taken ih the case. The first states that upon the trial of the cause, after the jury was sworn to try the issues joined, the plaintiff, before she had completed the examination of her witnesses in chief, called C. Hockman as a witness in her behalf, and propounded to him “the following question, after having examined him as to other matters: “ State whether 27. Gr. Sherman left at his death a widow, and whether she is still living ? ” To which question the defendant objected, but the court overruled the objection and allowed the witness to answer the same, who thereupon answered: “That the said Sherman left a widow who is now living, and who is the plaintiff in this suit; ” to which said ruling of the court the defendant excepted. The second bill of ■exceptions states that upon the trial of the cause the plaintiff, before she had completed the examination of her witnesses in chief, called C. Hockman as a witness in her behalf, and amongst other questions, propounded to said witness the following: “ State if the said 27. Gr. Sherman left any children that are now living ? ” To which question the defendant objected, but the court ■overruled the objection and allowed the witness to answer the question, and said witness thereupon answered that the said Sherman left five children now living, aged respectively twelve, ten, eight, six, four or five years—the *608 first, second and fourth being girls, and the third and fifth boys; to which ruling of the court the defendant ■.also excepted.
"We are of opinion that the circuit court did not err in allowing the said evidence of the witness, Hockman, to go to the jury. The facts to which said evidence relates are pertinent and material in regard to the ascertainment and apportionment by the jury of the amount of damages to be allowed under the statute (Code, p. 996, ch. 145, §§ 7, 8 and 9); and there is no necessity to make any averment in regard to the same in the declaration, as the right of action is not dependent thereon, but only the quantum and distribution of the damages are affected thereby. It is not necessary to defer the introduction of such evidence until after the finding by the jury of the right of action in favor of the plaintiff; but all the evidence in the case, not only in regard to the mere right of action, but also in regard to the quantum and distribution of the damages, may properly be introduced together, and before the jury retire to consider of their verdict. See Balt. Ohio R. R. Co. v. Wightman's adm'r., 29 Gratt. 431.
The third assignment of error is, that the circuit court erred in overruling the motion of the defendant to set aside the verdict and grant a new trial on the ground that the verdict was contrary to the evidence, contrary to the law, and contrary to the instructions given by the court, as stated in the third bill of exceptions.
The question presented by this assignment of error is, by far, the most important one arising in the case, being in effect, whether upon the merits, the verdict ought not to have been in favor of the defendant, even conceding the correctness of the decision by the court of all the other questions decided in the case.
The facts proved on the trial of the cause are certified in the said third bill of exceptions. According to the facts *609 as so certified the plaintiff’s intestate was killed on the track of the defendant’s railroad by the cars of the defendant, which ran over him while on his way from home to his place of business in the town of Edinburg, the two places being distant from each other about three-quarters of a mile. It is not pretended that the act which caused the death was wilfully done by the defendant. It was certainly the result of an accident, but whether such accident was occasioned by the neglect of the defendant, and whether there was contributory negligence on the part of the plaintiff’s intestate in producing the occasion, and whether, if there was, the negligence of the defehdant was such and so gross as, notwithstanding any such contributory negligence, to render the defendant responsible for the damages sustained by the plaintiff from the accident aforesaid, are the questions upon which this most important assignment of error seems to depend.
The facts of this case, as certified in the third bill of exceptions, are as follows:
“ That H. G: Sherman, the plaintiff’s intestate, on the morning of the 8d of September, 1874, at an early hour, left his home, distant some three-fourths of a mile from the phosphate works in Edinburg, for the purpose of going to said phosphate works, where he was employed as a workman; that his home was some five hundred yards outside the limits of. the corporation of Edinburg, and that he travelled a path leading across a partially plowed field to the railroad, and which path crosses said road near the mouth of the cut situated about seven hundred and seventy-five yards northeast of the railroad depot at Edinburg; that when said Sherman got "to the railroad he started down the track, either between or outside the rails, in the direction of said phosphate works, which are situated a "short distance from the railroad depot at Edinburg, on the southeast side of said *610 railroad; that he travelled two hundred and three yards in the direction of said phosphate works along the railroad track until he reached a point where he was killed, designated on the map by a red mark, which is two hundred and three yards from the point where he first came upon the track, and three hundred and eighty-nine and one-third yards from the said phosphate works; that he was a man of sober and industrious habits, and that he was a man of ordinary intelligence, and had been a school-teacher—had taught a country school for a few months; that he was a man of fair English education ; that he provided well for his family and gave them every attention for a man in his condition of life.
It was further proven that the defendant’s cars, known as the through freight train, consisting of engine Ho. 159, a camel-back ten-wheel engine and tender, and eleven freight cars with a passenger car in the rear, left Sandy Ilook, on the Baltimore and Ohio Railroad, at 11:15 o’clock on the night of September 2d, 1874, in chai’ge of Conductor Lewis Farr, with George Riley as brakes-man, John O. Dempsey as engineman, Lewis Heard as pilot, and William Donnovan as fireman; that when the train reached Winchester, which is about thirty-five miles northeast of Edinburg, one of the said freight cars was taken from said train, and another car was added to the train at Strasbfirg Junction, a station seventeen miles from Edinburg; that said last named car was the seventh ear from the engine ; that when the train reached Woodstock, a station five miles northeast of Edinburg, the train was behind time, and just below said town of Woodstock, the train became uncoupled on an up grade by the breaking of a coupling-pin, which had been put in at Strasburg Junction in the bumper of the car which had been attached to the train at that point, and the engine with the six -front cars ran past the depot at Wood.stock to a point some one hundred and fifty yards south *611 west of said depot, which breaking was not remembered by any of the hands on the train except George Riley, who coupled it up; that it then backed and was to the rear part which had been left some eight hundred yards northeast of said depot, by said George Riley, brakeman; that the train then went on after taking on a passenger at Woodstock, Mr. W. "W. Logan, who was .going to Staunton; that the train ran slowly up the grades until it crossed a point known as the summit, which is about one and one-half miles northeast of Edinburg depot, and from which point to the depot at Edinburg, the railroad is down grade at the rate of thirty-four feet to the mile; that there are two cuts through which said railroad passes between the summit and Edinburg, one •of them being about one hundred and fifty or two hundred yards long, the other about one hundred and fifty or two hundred yards long, and the southwestern mouth of the one nearest Edinburg being situated two hundred and thirty-six feet from the point where said E. G. Sherman came upon said railroad, out of the plowed field over which he came ; that the railroad runs on a considerable curve through said cut, and that about the time the engine got to the mouth of the cut next to Edinburg, the fireman discovered that the six rear cars had become detached from the rest of the train, and were about thirty yards in rear of same; that he immediately told the engine-man ; that the engineman immediately blew his whistle for brakes to be put down on the rear part which had become detached; that he also opened his valves and ran away from the rear part; and that he ran with the engine and other cars past the depot and water station at Edinburg, and stopped his engine about the bridge across Stoney creek, which bridge is one hundred and forty-five yards from the depot; that as soon as the whistle was blown for brakes, the conductor, who was in the passenger car in the rear of the detached section, responded to the *612 signal and went to the brake on the front part of the passenger ear, which was a double brake that operated on the front and rear of the car at the same time, and which he put down; the brakeman was out on the platform when the signal was given and immediately wen.t forward on the train, putting down the brakes, and that they checked the speed of the said detached section of cars-within from one hundred to two hundred yards from the mouth of the cut and before they reached the point where said Sherman was killed; but the evidence was conflicting as to the rate of speed at which both sections were running from a point on the line of the road about one hundred yards north of the point on said road opposite Sherman’s house to the point where Sherman was-killed. At the first-named point the testimony of the defendant fixed the rate of speed at from six to twelve miles per hour—-that of the plaintiff at thirty miles or passenger rate, and from the mouth of the cut next Edinburg to and beyond the place where Sherman was killed, the evidence of the defendant fixed the rate of speed from four to eight miles per hour, and the evidence of the plaintiff was that the running was very rapid and- twice as fast as their usual rate of speed at and along that part of the line; that said Sherman got out of the way or was not injured by the engine and front part of the train, but that he stepped on the track just as the detached section reached the point where he was killed, and that he was run over and killed by said detached section of cars, and was found lying on his back with his head toward "Woodstock and his feet toward the Edinburg depot, with his body and right leg inside the track between the rails, on the east side, and his left leg and arm outside the rail; that the engine-man, pilot and fireman on the front part of the train did not see him as they passed, and that neither the conductor nor brakesman who had charge of the detached *613 section saw nor knew he was on or near the track; that none of said employees knew that he was killed until the train arrived at Harrisonburg, a point on road about thirty-four miles southeast of Edinburg; that the rear part of the train which had become detached, was let gradually run down to a point near the depot at Edinburg, and that when it got there the •engine and other cars were backed and coupled to it, and that the engine took water and went on with the train in the direction of Harrisonburg; that when the rear part came down to the point near the depot an old hat was discovered on the bumper near the left-hand side—going west—of the car, which was the front car of said detached section, and which was a house-ear; and that George Riley, brakeman, saw the hat, and it was where the party coupling it up could see it, but no one about the depot knew that any one was hurt or killed until after the train had left the depot and started to Harrisonburg, when it was reported that a man had been killed; that there were some hands in the employ of the railroad company at the depot who, with others, went back in the direction where the deceased was lying, and took charge of his remains and brought them to the phosphate house; that a telegram was sent by the telegraph operator at Edinburg, to Mr. J. H. Averill, the assistant supervisor of the railroad, w'ho was at the time at Sandy Hook, and that he telegraphed to the conductor of the train at Harrisonburg that his train had killed a man, which was the first information any of the employees on the train had of the accident; that the accident occurred about sunrise on the morning of September 8d, 1874; that the weather had been dry for some time before; that it was a little foggy, and that the engine threw down considerable smoke, as is usual with freight camel-back engines; that from the point where said Sherman came upon the track to where he was killed, a *614 distance of two hundred and three yards, the track is perfectly straight and runs on a high embankment or in some places forty feet high, with nothing to obstruct the view; that there was a path on either side of the track and ample room for a train to pass without injuring a person walking in either path; that there-was also a path on either side of the embankment which would lead to the phosphate works, and a wagon road from a point northeast of where he was killed to the-phosphate works, near the foot of said embankment; that there was a path across the railroad about two hundred or two hundred and twenty-five yards south of the point where he was killed, but no path across the road near where he was killed; that Sherman took the route of the railroad to the phosphate house on his way to and from his work; that on Sunday people from the villages would walk out on that part of the track; that people going to Edinburg from Taylortown and that direction, frequently walked that route, and Iiockman, a witness for plaintiff, who had lived on the road from the time it was built, had during that time met as many as one hundred people on said railroad, and that cattle passing on said road would walk the paths at either side of the track, and to some extent the road had been used by country people—one or two families going to the stores in Edinburg from the northwest, the route from Taylortown. that way being five hundred yards nearer to the depot and adjacent stores; that the point where the deceased was killed was within the corporate limits of Edinburg, a town of five hundred inhabitants, two hundred and eighty-one yards within said corporate limits, but some distance from that part of the town which is built up, and some distance from any street or alley; that there were no houses near the point and none between the place where he came upon the track and the phosphate works, except one small house at the right or west *615 side of the road, designated on the map; that the engine was a camel-back ten-wheel engine, not as powerful as some engines of her make, but strong and enough for the purposes for which she was used; that the track from the north end of the cut next to Woodstock to the mouth of the cut next to Edinburg was in its usual condition; that considerable work had been done to it since the Baltimore and Ohio Railroad Company took possession of the road in September, 1873, and that although some of the cross-ties were sometimes found' loose, and some of the joints of the rails were sometimes lower than at other points (some dipped as much as an inch lower), yet it was regarded by the track-walker and supervisor of the track and the hands employed to keep it in order, as the best part of their track, and was regarded by all those who had any connection with the road as in good order and perfectly safe for trains; that the corporate limits of the town of Edinburg embraces a large quantity of farming land, some of it very rough and comparatively inaccessible, and a portion of this rough land lies adjacent to a part of the line of the railroad within the said corporation, and that it is three-fourths of a mile long by three-eighths of a mile wide, parallel with the Valley turnpike; and the corporate limits of Edinburg was only proven after a survey by an engineer, run according to the corporate lines heretofore established as the limits of said town as far back as 1857, and that the depot agent who was in charge of the depot when Sherman was killed, was present at said survey, but who was examined by the plaintiff and did not know at the time of the re-survey where the lines of the corporation west of the railroad ran—and by no other testimony; that from the point at which said Sherman was killed a person could see in the direction from which the train came one thousand and fifty-six feet, or three hundred and *616 fifty-two yards, along the line of said, railroad track, there being no intervening object,'and into the mouth the cut, the distance to ’ the mouth of the cut being eight hundred and forty-five feet; that one witness, at th© distance of four hundred yards, and at an angle of forty-five degrees from said Sherman, observed him step upon the track just as the train struck him; that another witness at a distance of about ninety yards, and at right angles to him, also observed the train strike him, as it was afterwards shown by his finding the body of said Sherman on the track at a point where he had seen something white fly down the bank, which he took to he a paper thrown off by a train hand, but which proved to be a cloth around his, Sherman’s dinner, which he had in a basket, which was also found at the foot of the embankment. Said witness, upon going to the foot of the embankment, found the basket, and then went up to the track and found the body; that the attention of all the parties who observed the train that morning (except Isaac Ruby, the witness who was ninety yards at right angles, as aforesaid, from Sherman), being some six or eight in number, was called to the train by the unusual whistling of the engine as it came out of the cut, and before it reached said Sherman and after it had become detached. It was also proven that freight trains always carried a passenger car or conductor’s car, commonly called a caboose, at the rear end of every train; that the attention of Charles Holtzman and G. W. Miley, two of plaintiff’s witnesses, who were one hundred yards olf, was attracted to the fact that the train, as it passed the depot at Woodstock, after it had broken loose as aforesaid, had no passenger cal- or caboose attached—the same having become uncoupled before it got to Woodstock, and the witness, Logan, who was at the depot observed the same thing; that it was the duty of the engineman, when he discovered his train was uncoupled, to blow for brakes and then to run far *617 enough away to keep the rear or detached part from running into his train; that it was also the duty, under the rules of the company, of those in charge of the rear part, to run it forward gradually to connect with the train, or to move forward to a point where a safe view could be obtained front and rear.
It was also proven that there was no brake on the front part of the foremost car of the detached section, but the brake was at the rear of said car, and that freight cars generally had but one brake; that the cause of the train becoming uncoupled after it passed the summit was the jumping out or breaking of a coupling-pin between the same-two cars which became uncoupled near Woodstock, but not in the same bumper, but no part of the pin was found in the bumper, where it is always found if the pin is broken; that said coupling-pin was a regular Baltimore and Ohio Bailroad pin, at least ten inches long, of usual length and thickness, which had been placed in the bumper by the brakesman, George Riley, before the train left Harper’s Ferry; that the usual length of the Baltimore and Ohio Railroad pin was not less than ten inches, and not less than one and one-fourth inches in diameter. It was further proven that pins came out from other cause than those named—from being too short or worn smooth; that a pin of greater length than that used would take longer in coming out, but that the pin used was as long as the pins usually used by other roads, and longer than that of the Chesapeake and Ohio, and Washington City, Virginia Midland and Great Southern railroad, and was considered safe; but'that the Manassas and Chesapeake and Ohio railroads used smaller pins; that the coupling used between said cars was the regulation coupling of the Baltimore and Ohio Railroad, a straight link coupling thirteen inches long and one and one-quarter inches in diameter, and that it was a safer link and bet *618 ter than the crooked link, the only other used by railroads, and the pin was a regulation pin, and that the regulation pin was considered a safé and good kind of pin by railroad men; that the two which became uncoupled were both house cars—one was known as a high bumper, the other as a low bumper car, which bumpers varied in height ten inches, and that the pin broke in the lower bumper casting at Woodstock, and the pin that jumped out or broke was in the high bumper casting, near Edinburg; that said last named pin was the largest and best pin the brakesmen could get at Harper’s Eerry; that it was a sound and good pin, and was examined by the brakesman before he put it in the casting at Harper’s Eerry; that the rear part of the train which became detached, and which ran over Sherman, consisted of a passenger car, four gondolas and a house car, the passenger car being the hindmost one, and the house car the foremost one; that both freight and passenger trains are liable at all times to become uncoupled by the breaking or jumping out of coupling pins; that such accidents are of very frequent occurrence on railroads, and that no means has yet been discovered or devised to prevent it; that all the hands on the said train were proven to be competent hands, and of general good character as prudent and diligent hands; that the engine-man, John O. Dempsey, was an experienced engineman, and had been in the employ of the company for some time, but had only made a few trips over the l’oad from Harper’s Eerry to Harrisonburg, commencing on the 26th August and continuing until after the 3d of September, 1874, to-wit: to October 24th; that the pilot, L. Beard, was an experienced brakesman who was acquainted with the road, and who was put on the engine with said John O. Dempsey to show him the road, and had been with said engineman as pilot from the 26th August, 1874, on every trip he made over said road up to and including *619 September 3d, 1874; that the fireman was an old and experienced fireman, and that the conductor and brakes-man were experienced and careful men, who their business, but the conductor had only been running over the road from Strasburg to Harrisonburg from the 20th of August, 1874, but the brakesman had been on said part of the road since September, 1873; that when the train crossed the summit the engineman shut off' steam and ran down 'the grade ; that after they crossed the summit one or two brakes were put down on the rear part of the train; that the brakesman’s duty was to attend to the brakes and also to any baggage, and also the company’s mail, both of which he received and delivered at stations, and it was proven that W. W. Logan was the only passenger.
It was further proved that there was a wagon road leading from Sherman’s home to the phosphate house, which was proven by Isaac Ruby, one of the plaintiff’s witnesses, to be always travelled when he lived in said house and worked at said phosphate works, which he did just previous to said Sherman’s occupancy of said house.
It was further proven that the track-walker on the road between Edinburg and "Woodstock passed over the road from Edinburg to Woodstock, through the two cuts, on the day before Sherman was killed, and also on the same day after he was killed, and that he found the road on both days in good order.
It was also proven by plaintiff that said Sherman left a widow and six children, one of whom has since died; that he was a man about thirty-five years of age.
Defendants also gave in evidence the map or diagram of the locality of the accident, which was proven to be a correct diagram made from actual measurement, and also profile maps of the same made from actual measurement, which maps are marked “A,” “B” and “0.”
*620 It was also proven that from eight to ten trains pass over said railroad every day, and have done so since 1873.
It was also proven that said Sherman had worked for hoard and twelve dollars per month, and this was °n^ ev^ence the value of his services,
Plaintiff’ also gave in evidence to the jury the map of ^ town of Edinburg, which is recorded in the deed book of said county of Shenandoah (a copy of which is marked “D ”—Clerk).
It was further proven that after the remains of the deceased were taken to the phosphate house, the deceased was examined by Dr. D. W. Prescott, one of his employers and one of the owners of the phosphate works, but which fact was proven by another person introduced as a witness; that at the two points where the train became detached on the morning of September 3d, 1874, George Eilev, the brakesman, was the only person who examined into the cause of the breaking loose of the train, and he coupled up the detached sections both at Woodstock and Edinburg; that it was the general duty of the conductor to see to the coupling of his train, he being responsible for it, in person or by his subordinates, for wh'ose conduct he is responsible.
It was proven that the schedule time of the said train was an average for the whole distance, from Sandy Hook to Harrisonburg, of twelve and one-half miles per hour; that the train was behind time, but as to what length of time the evidence was conflicting; that between. Woodstock and Edinburg, on the morning of September 3d, 1874, the conductor and brakesman who had been running the train during the whole night appeared to be sleepy and drowsy in appearance and movement before the train was discovered to be'detached, but that they were in and out of the car, and when the train was discovered to be uncoupled one of them was at the brake *621 on the passenger ear; that it was the duty of the brakes-man to be on the outside of the train on starting down a grade.
It was proven that a detached train of six cars going down a grade of thirty-four feet to the mile could be stopped within three hundred and fifty yards by the active exertions of a conductor and brakesman by the application of all the brakes, and that it was the conductor’s duty to aid in putting down the brakes; that when the rear part of the train was seen coming around the phosphate house, by the parties at the depot, it was coming slowly and gradually, and stopped before it got to the water tank; that the length of an ordinary railroad car is thirty-two feet, and that the length of an engine and tender is fifty feet from pilot or cow-catcher to the end of tender. Passenger cars average forty feet in length; that the railroad company were not in the habit of using bell-ropes on freight trains or such trains as the one hereinbefore described, and had not used them for several years, the same having been discarded as being too inconvenient and impracticable for freight trains, and that there was no bell-rope on this train connecting the rear car with the bell upon the engine; that such ropes would frequently but not always give notice of the separation of a train at the time when it occurred, but that it was difficult of use on freight trains on account of the frequency of their getting out of place, becoming fastened, and sometimes ringing the bell by accident and not by design, and because the company regarded them as useless, and that they have been generally discarded by railroads.
It was further proven that the train was first discovered by the men on the engine and by the conductor on the detached portion of the train, and by the blowing for the brakes, to be broken loose at a point somewhere between a point opposite Sherman’s house and the north end of *622 the cut next to Edinburg, which cut is between one hundred and fifty and two hundred yards long.
It was further proven that the trains uniformly stopped at Edinburg, and that the trains were allowed, under special orders, to run fifteen miles per hour, but not to exceed that rate. It was proved that the penalty of the violations of the rules of the Baltimore and Ohio Company by its employees wras suspension or dismissal.”
First. Was the accident which produced the death of the plaintiff’s intestate, Hathan G-. Sherman, occasioned by the neglect of the defendant, the Baltimore and Ohio Railroad Company ?
The defendant’s cars which occasioned the damage, were known as the through freight train, consisting of a camel-back ten-wheel engine and tender Rnd eleven freight cars, with a passenger car in the rear; and was under the charge of Lewis Farr as conductor, George Riley as brakesman, John O. Dempsey as engineman, Lewis Beard as pilot, and William Donnovan as fireman. It is not pretended that the number of hands in charge of the train was not ample for its safe and proper management, nor that they were not properly distributed among the necessary portions of the work. It is certified as part of the facts proved in the cause, “ that all the hands on the said train were competent hands, and of general good character as prudent and diligent hands; that the engineman, John G. Dempsey, was an experienced engineman, and had been in the employ of the company for some time, but had only made a few trips over the road from Harper’s Ferry to Harrisonburg, commencing on the 26th August-, and continuing until after the 3d of September, 1874, to-wit: to October 24th; that the pilot, L. Beard, was an experienced brakesman, who was acquainted with the road, and who was put on the engine with said John C. Dempsey to show him the road, and had been with said engineman as pilot from *623 the 26th August, 1874, on every trip he made over said road up to and including September 3d, 1874; that the fireman was an old and experienced fireman, and that the conductor and brakesman were experienced and careful men, who understood their business; but the conductor had only been running over the road from Strasburg to Harrisonburg from the 20th August, 1874, but the brakesman had been on said part of the road since September, 1873?’
It does not appear that any of the hands, thus proved to have been sufficient in number and competency for the duties they had to perform on the occasion referred to, were remiss in performing the duties which devolved upon them on the special occasion referred to. Such an uncoupling of cars as occurred on that occasion, was proved to have been a matter of common, if not frequent occurrence, without any default on the part of the company. The certificate of facts on this subject being: “That the cause of the train becoming uncoupled after it passed the summit, was the jumping out or breaking of a coupling-pin between the same two cars which became uncoupled near "Woodstock, but not in the same bumper, but no part of the pin was found in the bumper, which is always found if the pin is broken; that said coupling-pin was a regular Baltimore and Ohio Railroad pin, at least ten inches long, of usual length and thickness, which had been placed in the bumper by the brakes-man, George Riley, before this train left Harper’s Ferry; that the usual length of the Baltimore and Ohio Railroad pin was not less than ten inches, and not less than one and one-fourth inches in diameter. It was further proved that pins came out from other causes than those named—from being too short or worn smooth; that a pin of greater length than that used would take longer in coming out; but that the pin used was as long as the pins usually used by other roads, and longer than that of *624 the Chesapeake and Ohio, Washington City, Virginia Midland and Great Southern railroads, and was considered safe; but that the Manassas and Cheaspeake and Ohio railroads used smaller pins; that the coupling used between the said cars was the regulation coupling of the Baltimore and Ohio Railroad, a straight link coupling, thirteen inches long and one and one-quarter inches in diameter, and that it was a safe link, and better than the crooked link, the only other used by railroads, and the pin was a regulation pin, and that the regulation pin was considered a safe and good kind of pin by railroad men; that the two which became uncoupled were both house cars; one was known as a high bumper, the other as a low bumper car, which bumpers varied in height ten inches, and that the pin broke in the low bumber casting at Woodstock, and the pin that jumped out or broke was in the high bumper casting near Edinburg; that said last named pin was the largest and best pin the brakesman could get at Harper’s Eerry; that it was a sound and good pin, and was examined by the brakesman before he put it in the casting at Harper’s Ferry; that the rear part of the train which became detached, and which ran over Sherman, consisted of a passenger car, four gondolas and a house car, the passenger car being the hindmost one, and the house car the foremost one; that both freight and passenger trains are liable at all times to become uncoupled by the breaking or jumping out of coupling pins; that such accidents are of very frequent occurrence on railroads, and that no means have yet been discovered or devised to prevent it.”
It was proved that the railroad, at and near the place where the accident occurred, was in good order at the time it occurred, it being certified as a fact “ that the ‘track-walker ’ on the road between Edinburg and Woodstock, passed over that part of the road through the two-' cuts on the day before Sherman was killed, and also on *625 the same clay after he was killed, and that he found the road on both days in good order.” It does not appear that the discovery was not made on the train of uncoupling of the cars near Edinburg in a reasonable time after it occurred, or that the best means were not used to restore their connection, or that it was not restored in a reasonable time after the separation occurred. It does not appear that there was any want of diligence on the part of any of the hands on the train in looking out, after being informed of such separation, for any persons who might happen to be upon the track, and warning them against danger. The deceased, though on the track when the front part of the train approached the place where he was walking, stepped off the track before it reached him, and thus saved himself at that time; but he stepped back upon the track after the front part of the train had passed, and precisely at the time of so stepping back he was struck by the rear part of the train and killed; so that none of the hands on the train had time to warn him of his danger even if they had seen him when he stepped back on the track, which they did not.
“ The evidence was conflicting,” according to the certificate of facts, “ as to the rate of speed at which both sections were running, from a point on the line of the road about one hundred yards north of the point on said road opposite Sherman’s house, to the point where Sherman was killed. At the first-named point the testimony of the defendant fixed the rate of speed at from six to twelve miles per hour, that of the plaintiff at thirty miles, or passenger rate, and from the mouth of the cut next Edinburg to and beyond the place where Sherman was killed, the evidence of the defendant fixed the rate of speed at from four to eight miles per hour, and the evidence of the plaintiff was that the running was very *626 rapid and twice as fast as their usual rate of speed at and along that part of the line.”
If there wras any neglect of duty on the part of the defendant which can be said to have occasioned, in whole or in part, the accident which produced the death of the plaintiff’s intestate, it must have been the undue speed at which the train was running when the accident occurred. Upon that question we have seen the evidence was conflicting ; according to that of the' defendant, the speed was certainly not undue, but was very moderate. According to that of the plaintiff', such speed exceeded what had been prescribed by the regulations of the defendant, but whether it can be said to have been undue or not, so far as concerns this case, is, to say the least, very doubtful. These regulations are adopted for the convenience and safety of the defendant and of those who. travel upon the road as passengers in the cars of the •defendant, or those who cross the road at a place where they have a legal right to cross it, and not of those who may choose to walk upon the road for their own convenience or pleasure, and without any legal right so to use it. It was “proven that the trains uniformly stopped at Edinburg, and that the trains were allowed, under special orders, to run fifteen miles per hour, hut not to exceed that rate. It was proved that the penalty of the violations of the rules of the Baltimore and Ohio Company by its employees was suspension or dismissal.”
But even if there was any neglect of duty on the part of the defendant which can be said to have occasioned, in whole or in part, the accident which produced the death of the plaintiff’s intestate, it is necessary to en-quire :
Secondly. Was there contributory negligence on the part of the plaintiff’s intestate in producing the cause of his death ? We think there certainly was. He chose to run the risk' of walking on the railroad as a part of his *627 way from Ms home to his place of labor at the phosphate works, situated a short distance from the railroad depot at Edinburg. “He travelled two hundred and yards in the direction of said phosphate works, along the railroad track until he reached a point where he was killed; which is two hundred and three yards from the point where he first came upon the track and three hundred ánd eighty-nine and one-third yards from the said phosphate works.” There was no right of way, public or private, along this part of the railroad track, except the public right of way of the Baltimore and Ohio Railroad Company. There was no necessity for using it as a private way, even if there was any convenience in so doing. There was a path on each side of the track which might just as well have been used for walking as the track, and just as conveniently, and with perfect safety. “It was further proved that there was a wagon road leading from Sherman’s house to the phosphate house, which was proven by Isaac Ruby, one of plaintiff’s witnesses, to be always travelled when he lived in said house and worked at said phosphate works, which he did just previous to said Sherman’s occupancy of said house.” Sherman knew that trains travelled the railroad many times every day, and might travel it at unexpected times, and that trains might unexpectedly become uncoupled at any time, and that a person who chose to walk on the track instead of walking in one of the side paths or in the road at the foot of the embankment on which the railroad ran, must do so at his own risk, and must take care to look out for and avoid danger by stepping off' the track in time.
It is true the place where the accident occurred was within the territorial limits of a town containing five hundred inhabitants; but it was not within the settled or improved part of the town, and was not in one of its streets; but was “some distance from that part of the *628 town which is built up, and some distance from any street or alley; there were no houses near the point, and none between the place where” Sherman “came upon the track and .the phosphate works, except one small house.” “ The corporate limits of the town of Edinburgembrace a large quantity of farming land, some of it very rough and comparatively inaccessible, and a portion of this rough land lies adjacent to a part of the line of the railroad within the said corporation.” “Erom the point at which said Sherman was killed, a person could see in the direction from which the train came 1,056 feet, or 352 yards, along the line of said railroad track, there being no intervening object, and into the mouth of the cut, the distance to the mouth of the cut being eight hundred and forty-five feet.” The attention of all the parties who observed the train that morning, except Isaac Ruby, “ being some six or eight in number, was-called to the train by the unusual whistling of the engine as it came out of the cut, and before it reached said Sherman, and after it' had become detached. It was-also proven that freight trains always carried a passenger car or conductor’s car, commonly called a caboose, at the rear end of every train; that the attention of Charles Holtzman and G. W. Miley, two of the plaintiff’s witnesses, who were one hundred yards off, was-attracted to the fact that the train as it passed the depot at Woodstock, after it had broken loose as aforesaid, had no passenger car or caboose attached, the same-having become uncoupled before it got to Woodstock; and the witness Logan, who was at the depot, observed the same thing.”
That the defendant did not prevent Sherman from walking on the track of the railroad, or object to his doing so, was merely a permission to him to do so at his peril. He knew the danger he thereby incurred, and how careful he would have to be to guard against it; *629 and if he chose to encounter it on his own responsibility, the defendant was willing that he should do so. It cannot be inferred from such permission that the defendant intended to impair or diminish in the least degree its right to the full use of the road. To have that effect the evidence of their consent, if it could be given at all, should at least be very clear. It is not pretended that there is any such evidence in this case.
The instinct of self-preservation seemed therefore to require that Sherman should use incessantly, while he was walking upon the track, both his eyes and his ears to discover any signs of danger, whether approaching from behind or before. Had he heeded this plain admonition he would certainly have escaped all danger. His walking upon the track instead of in one of the paths on the sides of it, and his not properly looking at or listening for danger while so doing, have been the chief, if not the only cause of death, and at least made him guilty of contributory negligence in regard to such results. It now only remains to enquire on this branch •of the subject:
Thirdly. Was-the negligence of the defendant, if any, ■such and so gross as, notwithstanding such contributory negligence, to render the defendant responsible for the damages sustained by the plaintiff' from the accident aforesaid ?
We think that a negative answer to this question plainly results from what has already been said, and we will therefore say nothing more on the subject, but to ■express our conclusion in regard to it, which is that the •circuit court erred in overruling the motion of the defendant to set aside the verdict and grant a new trial.
We are therefore of opinion, that for that cause the judgment ought to be reversed and annulled, the verdict of the jury set aside, and the cause remanded for a new trial to be had therein according to the principles herein- *630 before declared, which makes it unnecessary to consider* or decide the questions presented by the remaining bills of exceptions.
We have not referred .to any books or cases (with a single exception) in the foregoing opinion. The law on the subject, so far as material, can be found in Sherman & Eedfield on Negligence, ch. 3, p. 23, “contributory negligence”; ch. 17, p. 332, “injuries causing death”; ’Wharton on Negligence, ch. 9, “contributory negligence”; and in the cases referred to in the notes to-those chapters.
The judgment wás as follows:
This day came again the parties by their counsel, and the court, having maturely considered the transcript of the record of the judgment aforesaid and the arguments-of counsel, is of opinion, for reasons stated in writing and filed with the record, that the circuit court did not err in overruling the demurrer to the declaration and each count thereof; nor in allowing the evidence of the witness Hockman to go to the jury, in reference to the family left by the deceased (N. G. Sherman) after objection, as mentioned in the first and second bills of exceptions taken in the case.
But the court is further of opinion, that the circuit court did err in overruling the motion of the defendant to set aside the verdict and grant a new trial, on the-ground that the verdict was contrary to the evidence,, contrary to the law, and contrary to the instructions given by the said court, as stated in the third bill of exceptions.
Wherefore, without deciding whether or not the said circuit court erred in refusing to give to the jury the thirty-three instructions which were offered by defendant’s counsel, or any of them; or in giving to the jury *631 the twenty-eight instructions which were given hy the said court, or any of them, as mentioned in the fourth bill of exceptions taken in the case; or in refusing give to the jury the instructions líos. 19, 26 and 33, and in lieu thereof giving to the jury the twenty-eight instructions aforesaid, as mentioned in the fifth bill of exceptions taken in the case; the decision of the said questions, or any of them, being wholly immaterial and unnecessary to the determination of this case, in the view taken of it by this court, that according to the facts cei’tified in the record to have been proved on the trial, the law is plainly in favor of the defendant in the court below, the plaintiff in error here, so that, if the facts proved on another tidal be substantially the same as proved on the former trial, the case must then, according to the said view, be determined in favor of the plaintiff in error; it is considered, adjudged and ordered by the court, that for the error aforesaid the said judgment be reversed and annulled, and that the plaintiff in error recover against the defendant in error its costs by it expended in the prosecution of its writ of error aforesaid here, to be levied of the goods and chattels of her said intestate in her hands to be administered. And it is further adjudged and ordered, that the said verdict of the jury be set aside, and the cause remanded to the said circuit court for a new trial to be had therein in conformity with the principles declared' in the foi’egoing opinion and judgment; which is ordered to be certified to the said circuit court of Shenandoah county.
Judgment reversed.